IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO: 08-61952-CIV-LENARD/GARBER

KATHERINE EVANS

      Plaintiff.

vs.

PETER BAYER, in his individual capacity

      Defendant.

_____/

## DEFENDANT, PETER BAYER'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

**DEFENDANT**, Peter Bayer ("Bayer") by and through undersigned counsel, and pursuant to Florida Rule of Civil Procedure 1.140(b)(6) and Local Rule for Southern District of Florida 7.1 hereby files his Motion to Dismiss Plaintiff's Complaint and would show:

### PROCEDURAL POSTURE AND FACTUAL BACKGROUND

Because this is a motion to dismiss, Mr. Bayer accepts, as he must, the allegations in Plaintiff's Complaint as true. Of particular importance, however, are the attachments to that Complaint and the weight that must be accorded them. As can be seen from the attachments, Plaintiff created a group on Facebook, a social internet site. Creation is more than merely posting an item or expressing a view. Plaintiff is identified as the Administrator and Creator of the group. Additionally, the Notice of Suspension of up to 10 Days indicates that Plaintiff was disciplined for "Bullying/Cyberbullying/Harassment towards a staff member" and "Disruptive behavior." This Notice was signed by Mr.

Bayer as well as the Behavior Specialist at the school, Steve Bruns. As such, these allegations are also accepted as true and if they are inconsistent or contradict any allegations in the complaint, pleading requirements maintain that the allegations in the attachments are controlling.

## MEMORANDUM OF LAW

### SUMMARY OF ARGUMENT

Mr. Bayer is the principal of The City of Pembroke Pines Charter High School (Pembroke Pines High School). As alleged in the Complaint, Plaintiff was a student at that school and graduated in 2008. During her senior year, the student created a group page on Facebook entitled, "Ms. Sarah Phelps is the worst teacher I've ever met." The group's purpose was for other students to voice their disdain for Ms. Phelps: "To those select students who have had the displeasure of having Ms. Sarah Phelps, or simply knowing her and her insane antics. Here is the place to express your feelings of hatred." Exhibit A, Plaintiff's Complaint. Included in this group page is Ms. Phelp's photograph. In response, the only postings to this group were students defending Ms. Phelps and attacking Plaintiff. *Id.* Eventually, the student removed the group.[1] Nevertheless, the group and its purpose came to the attention of Mr. Bayer in his capacity as Pembroke Pines High Charter School's principal and he was required to advise the teacher of the posting so the teacher would not be caught off guard in her classroom by students initiating discussion about it.

---

[1] Despite Plaintiff's allegation that she voluntarily removed the group posting and that Mr. Bayer did not learn of the posting until after it had been removed, this is not true. Moreover, Plaintiff further claims that several weeks passed between the time she removed the group and her discipline. This is equally not true, but Mr. Bayer accepts these pleadings as he must for purposes of this motion because neither impacts whether the actions of Mr. Bayer are protected by qualified immunity.

The primary issue when dealing with this type of immunity is to determine whether there has been a violation of the student's constitutional right **and** that this right was clearly established at the time. That is, if the right is not clearly established so a reasonable person in Mr. Bayer's position would not know that his actions could violate a clearly established constitutional right, his actions are protected by qualified immunity. Since that right, as expressed in a group posting on the internet by a student about a teacher, was not clearly established at the time he set the three-day suspension as punishment, he is qualifiedly immune.

Secondarily, the standard for student discipline when expressing First Amendment rights is clear that a school can still discipline students under specific circumstances. Therefore, even if Mr. Bayer is not immune, his actions were sanctioned by the case law in this area. Specifically, disruptive behavior can be punished by discipline so long as there is a viable threat of disruption. More importantly, a school official need not wait for consequences to occur before acting. In the context of the present case, Mr. Bayer was well with his responsibilities as a high school principal to take appropriate and measured steps to keep a situation from escalating further.

Finally, even if there is a violation and Mr. Bayer has acted inappropriately by his actions in his individual and not official capacity, he cannot correct this in any other way than in his official capacity, but not as an individual, which is his posture in this matter. Put another way, Mr. Bayer, the individual, cannot in any way correct, amend, destroy, or expunge any records referring to Plaintiff. However, if the Complaint against Mr. Bayer is for even nominal damages in his individual capacity, he is qualifiedly immune because he was acting in good faith as evidenced by the fact that the right alleged to be violated

was in no way clearly established. As such, this Complaint does not allege any cause of action for which relief can be granted because the individual Mr. Bayer cannot undertake to correct any actions involving official school records.

## ATTACHMENTS ARE WITHIN THE FOUR CORNERS OF COMPLAINT

In Florida, the courts have repeatedly held that attachments to a complaint are part of the complaint for purposes of addressing a motion to dismiss. *See, e.g., Abele v. Sawyer*, 750 So. 2d 70, 74 (4th D.C.A. 1999)("While a court must confine itself its review to the four corners of the complaint and must accept as true all well-pleaded allegations, [] the exhibits are encompassed with the four corners of the complaint and must be considered therewith."(Internal citations omitted)). As the law has progressed, the courts have routinely viewed allegations in a complaint with statements made in attachments and have found repeatedly that the statements in the attachment are controlling if they contradict or conflict with allegations made in the complaint. *See, Anderson v. U.S.*, 245 F.Supp. 2d 1217, 1221 (M.D. Fla. 2002)("The court will not accept as true allegations that are contradicted by facts that can be judicially noticed or by other allegations or exhibits attached to or incorporated in the pleading."); *Harry Pepper & Assoc. v. Lasseter*, 247 So. 2d 736, 736-737 (3d D.C.A. 1971)("There is an inconsistency between the general allegations of material facts in the amended complaint and the specific facts revealed by the exhibit (deposition) and they have the effect of neutralizing each allegation as against the other thus rendering the pleading objectionable."); *Shelton v. Eisemann*, 79 So. 75, 77 (Fla. 1918) ("Now, if the allegations of the declaration which contained only one count are repugnant to and inconsistent with each other in matters of substance, or if the allegations of the declaration are inconsistent and repugnant to a

material clause in the contract declared upon, then the declaration is bad and the judgment of the court below was correct."); *Williams v. Peninsular Grocery Co.*, 75 So. 517, 524 (Fla. 1917)("if the statements in a cause of action attached to and made part of the declaration are inconsistent with and repugnant to the allegations in the declaration, the latter fails to state a cause of action.").

As such, when there is an attachment and there are statements of fact included therein, those statements are considered part of the complaint and must be given deference by the Court, even if repugnant to the allegations in the Complaint. *Shelton,* 79 So. at 77. If these two are contradictory, at minimum, the pleading is objectionable and should be dismissed. *Lasseter,* 247 So. at 736-737. Indeed, the allegations in the complaint no longer have the cloak of presumptive correctness that generally protects allegations in a complaint and are no longer presumed true. *Anderson,* 245 F.Supp. 2d at 1221. Courts throughout Florida will dismiss complaints that include attachments which serve to negate or bring into doubt the allegations in the complaint itself. Therefore, anything found attached to the Complaint, in this case, a reproduction of the web page created by Plaintiff and Plaintiff's suspension documentation referencing the precise rule relied upon by Mr. Bayer.

## QUALIFIED IMMUNITY

The Supreme Court has held that qualified immunity protects "all but the plainly incompetent or those who willingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 441 (1986). There is a two-step inquiry to determine whether the individual is entitled to qualified immunity. Those steps require that the court determine whether the individual was acting within the scope of his/her discretionary authority. If so, the next step is

whether the actions taken violate a clearly established law or right.  In this case, Plaintiff has brought an action against Mr. Bayer, in his individual capacity only.

Mr. Bayer is entitled to qualified immunity for the claims brought.  An individual sued under § 1983 in his or her individual capacity is qualifiedly immune from the action if it can be shown that he was acting within his discretionary authority and there was no clearly established constitutional right that a reasonable person in that individual's position knew or should have known existed.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The determination of the availability of the qualified immunity defense is a matter of law for the Court to decide and it must be decided as early in the litigation as possible.

> *Harlow* thus recognized an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated a clearly established law.  The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if the case is erroneously permitted to go to trial....
>
> An appealable interlocutory decision must satisfy two additional criteria: it must "conclusively determine the disputed question," [] and that question must involve a "clai[m] of right separable from, and collateral to, rights asserted in the action[.]"  The denial of a defendant's motion for dismissal or summary judgment on the ground of qualified immunity easily meets these requirements.

*Mitchell v. Forsyth*, 472 U.S. 511, 526-527 (1985)(emphasis in original)(internal citations omitted).  As such, the Supreme Court contemplated that qualified immunity could be raised on a motion to dismiss and, given the nature of the constitutional right claimed to have been violated, the Court can determine if the right, as viewed given the circumstances of the action and the state of the law in that area, is so "clearly established" that a individual could be held liable for such acts.

The first inquiry a court needs to undertake is whether the complaint has alleged a violation of a constitutional right at all.  If there is no such violation, the court can end its analysis as the § 1983 claim would then fail.  However, if there is an allegation of a constitutional violation, the court must continue to determine if that right was so well established as to put the individual on notice that he or she was violating an individual's rights.  It is not enough to find that freedom of speech is a clearly established right, the court must analyze all the circumstances and find that the alleged facts are sufficient to create a clearly established constitutional right and that the defendant was in a position to either know or should have known.

> For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right.  Much the same could be said of any other constitutional or statutory violation.  But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow*.  Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply be alleging violation of extremely abstract rights.  *Harlow* would be transformed from a guarantee of immunity into a rule of pleading.  Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages."  []  It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly establish" in a more particularized, and hence more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

*Anderson v. Creighton*, 483 U.S. 635, 639-640 (1987)(internal citations omitted).  Therefore, the question before this court is not whether the First Amendment protects speech, but whether the disciplinary action taken by a principal with respect to a student

who printed a malicious comment on a public and accessible website would violate that student's First Amendment right.

The specific violation here alleged is that a student was suspended for creating a "group" posting on Facebook, a social internet site, that was directed at a teacher in her school and calling into question the teacher's abilities and credentials. In this particular case, the student called that teacher, "the worst teacher I've ever met." This phrase is defamatory on its face and gives rise to a cause of action for defamation *per se* by the teacher. There is no need, however, to engage in an analysis as to whether a cause of action for defamation would survive legal challenge, it is sufficient to state that the statement was made against a particular teacher. Regardless of the allegations that there was no disruption of the school, the potential for disruption is sufficient for a school official to take action, *see, Layshock v. Hermitage School District, et al*, 496 F.Supp. 2d 587, 596 (W.D. Penn. 2007)( "It is clear that school administrators need not wait until a 'substantial disruption' has already occurred prior to taking action."), particularly in this case where these is a school district policy in effect against cyberbullying. See, Exhibit B to Plaintiff's Complaint ("We regret to inform you that in accordance with School Board of Broward County Policy #5006: Katherine has been suspended for a period of 3 days.").

Now the only question remaining is, even if this suspension be considered an infringement on Plaintiff's First Amendment rights, whether such a right was "clearly established." Student discipline for engaging in first amendment expression has had several treatments by the courts, including the Supreme Court. The more difficult question comes in viewing this expression when it is expressed in a widely disseminated

medium such as the internet.  Recently, several courts have grappled with situations such as these and come up with widely varied decisions.  Two law review articles have recently pointed out the discrepancy between courts applying the current Supreme Court rulings as to student First Amendment rights.  *See, e.g.,* Kara D. Williams, *Public Schools vs. Myspace & Facebook: the Newest Challenge to Student Speech Rights*, 76 U. Cin. L. Rev. 707, 712-720 (2008) (comparing several lower court decisions that used the prevailing standards to either uphold the student's punishment or invalidate it); Kyle W. Brenton, *Bonghits4Jesus.com? Scrutinizing Public School Authority Over Student Cyberspeech Through the Lens of Personal Jurisdiction*, 92 Minn. L. Rev. 1206 (2008).

The District Court in Connecticut, D, pointed out this very same unsettled nature of the law in its opinion, *Doninger v. Niehoff*, 2009 WL 103322, 1* (D. Conn. Jan. 15, 2009).

> But the contours of the law in this area are still unclear, as even a cursory review of the legal commentary shows.  Thus, a recent law review article observes that "when it comes to student cyber-speech, the lower courts are in complete disarray, handing down ad hoc decisions that, even when they reach an instinctively correct conclusion, lack consistency, controlling legal principles."

*Id.* at *10.  The court then continued to cite various law review articles, all of which point to confusion and conflict in district court decisions, lack of uniformity, and a judiciary "in a state of tumult" regarding student cyber speech.

In an earlier case regarding the preliminary injunction, the Second Circuit in *Doninger v. Niehoff*, 527 F. 3d 41 (2d Cir. 2008), the court determined that the student's parent had failed to allege a sufficient likelihood of success on the merits to warrant an injunction to prevent a suspension from being instituted against the student.  The student had engaged in an extensive emailing campaign and then made a derogatory entry in a

blog about the administration when an event was threatened with postponement. Despite the fact that this activity clearly occurred off school grounds, but in an accessible internet site, the school removed her from eligibility for student council. The Second Circuit in upholding the district court's finding that an injunction was not warranted held that a school may properly restrict speech that may be "potentially disruptive," that the speech was "at best misleading and at wors[t] false," and that plaintiff's "extracurricular role as a student government leader" was related to the punishment of precluding her from serving in that capacity. *Doninger*, 527 F. 3d at 50-52.    The *Doninger* court further found support in the Supreme Court's holding in *Wood v. Strickland*, 420 U.S. 308, 326 (1975) that "'[t]he system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members' and we are not authorized to intervene absent 'violations of specific constitutional guarantees.'" *Doninger*, 527 F. 3d at 54.

In the Middle District of Florida, in a case involving a principal being sued for taking disciplinary action against a student who violated a school board policy against drinking alcohol, the principal was found qualifiedly immune for following the school board's policy.   The court ruled on a motion to dismiss that there was no clearly established right at the time of the punishment that would have put the principal on notice that he was violating a clearly established right. The Middle District Court specifically found that,

> Defendant Evans, as a high school principal, must exercise his discretion in implementing the Code of Student Conduct so as to maintain discipline at all school functions.  As discussed by the Supreme Court in *Wood v. Strickland, supra*, school officials are continually required to determine if violations of school regulations have occurred and, if so, the appropriate sanction for those violations. 420 U.S. at 319, 95 S.Ct. at 999.  Considering the discretion required by these

activities, denying school officials a certain measure of immunity in carrying out these duties would hinder, rather than foster, principled decision-making.

*Kubany v. The School Board of Pinellas County*, 839 F.Supp. 1544, 1550 (M.D. Fla. 1993). That discretion is no less true in the instant case. As is clear from the attachments to the Complaint, Mr. Bayer was interpreting a School Board policy and acting as he deemed appropriate under the circumstances. Therefore, this Complaint must be dismissed as Mr. Bayer is protected from suit by qualified immunity.

## NO INFRINGEMENT OF FIRST AMENDMENT RIGHTS

A school official may discipline a student for disruptive activity. There are times when there is a fine, but fuzzy, line between disruptive activity and protected First Amendment expression. Oftentimes, school officials are left to their own good judgment whether to discipline or simply let the matter stand. If there is a possibility that the school will be disrupted, simply ignoring the expression may not be a viable option. The next consideration is what would be the commensurate punishment for the "expression" in light of the potential or actual disruption.

> On the other hand, the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools.... Our problem lies in the area where students in the exercise of First Amendment rights collide with the rules of the school authorities.

*Tinker v. Des Moines Ind. Community Sch. Dist.*, 393 U.S. 503, 507 (1969)(internal citations omitted).

In *Tinker*, the Court was faced with students who intended to wear a black armband as a protest to the Vietnam War. The students were warned that to do so would result in a suspension, which did occur. The Supreme Court ruled that this expression could not be infringed with a mere pretense or suspicion of a disruption. Clearly, the

Court understood that this political speech was protected as it would be protected for any citizen. "Students in school as well as out of schools are 'persons' under our Constitution. They are possessed of fundamental rights which the States must respect, just as they themselves must respect their obligations to the State." *Id.* at 511. As such, the Court ruled that students under these circumstances could express their opinions, so long as in doing so they did not disrupt or interfere with appropriate discipline in the operation of the school. *Id.* at 513. The Court retained the premise that a student's expression was not completely protected for all purposes.

> But conduct by the student, in class or out of it, which for any reason -- whether it stems from time, place or type of behavior – materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.

*Id.*

Subsequent to *Tinker*, the Court decided *Bethel Sch. Dist. #403 v. Fraser*, 478 U.S. 675 (1986). There, the Court was faced with a student giving a nominating speech for a fellow student at a school sanctioned gathering using sexual innuendo. The student's speech caused disruption of school activities that included students hearing the speech being shocked and embarrassed; students reacting by mimicking the sexual content being used; and one teacher claiming that she had to postpone her lesson in one class on the follow day to discuss the speech within their classes. While these "disruptions" may appear minor, they were referenced by a Court upholding the school's right to discipline the student for the use of that speech.

In doing so, the Supreme Court was careful to explain that "in *Tinker*, this Court was careful to note that the case did 'not concern speech or action that intrudes upon the work of the schools or the rights of other students.'" *Fraser*, 478 U.S. at 680. The Court

pointed out it had already decided in *New Jersey . T.L.O.*, 469 U.S. 325 (1985), "that the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Id.* at 682. Moreover, the Court further cited *T.L.O.* for the precept "that 'maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship.'" *Id.* at 686. Then it proceeded to hold that "the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Id.*

Fundamentally, the *Fraser* Court was recognizing the dangers of an unbridled protection of any speech that reaches and disrupts the operations a school. Since the precise boundaries of expression that requires protection by the First Amendment, regardless of the setting, and those expressions that do not rise to the level of such discourse, but serve only to interfere with a school's operations and detracts from the essential functions of those schools is difficult, if not impossible, to set, the Court engaged in a balancing act and resolved that:

> [T]hese "fundamental values" must also take into account consideration of the sensibilities of others, and, in the case of a school, the sensibilities of fellow students. The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior. Even the most heated political discourse in a democratic society requires consideration for the personal sensibilities of the other participants and audiences.

*Id.* at 681.

Whether the case at bar is analyzed under *Tinker* or *Fraser*, the result is the same. The student was not being punished for the expression of an unpopular or controversial position, but by an expression of anger and hate for one of her teachers in a widely disseminated medium: the internet. To argue that the student could express the opinion stated in the web page in a lunch room without fear of reprisal or discipline misses the fundamental difference between the lunch room speech and the internet speech. Only a select few will hear her speech in the lunch room and a robust and possibly productive debate may ensue. In contrast, the speech on the internet sparks only limited debate, which may or may not be productive, but it also potentially injures the individual referenced as well as others who may know the individual and may form incorrect or unfair opinions based upon that speech. In short, for the student to disparage the teacher in this manner has serious consequences for the potentially defamatory content and for which the teacher would be unable to properly respond. All school officials are entitled to protect against just this type of disruption by properly exercising control and discipline as necessary.

Students have constitutional rights and they are protected to the extent necessary to uphold those rights in a free society. *Tinker,* 393 U.S. 503 (1969). However, as *Tinker* held, a student's constitutional rights do not stop at the school house gate. That gate swings both ways. Therefore, the student is protected, but with an eye toward proper discipline and order in a school setting. Should a student act in a way that is disruptive to the school setting, those actions are subject to appropriate discipline that is commensurate with the student's actions. Therefore, a student wearing an armband protesting the Vietnam War is protected in his expression of a First Amendment right, *Tinker*, but not if

he is advocating drug use. *Morse v. Fredericks*, 127 S.Ct. 2618 (2007).  Unfortunately, the Supreme Court of the United States has been unable to draw a finite, clear line where the rights end and disruption begins.  Nevertheless, the Court has never stated that a school can never discipline a student for actions which may otherwise be considered protected by the First Amendment. *Fraser*, 478 U.S. at 681.  As such, in this case, Plaintiff has failed to state a cause of action because she has failed to show that the discipline meted out to her for her improper and derogatory speech was outside the bounds of appropriate school disciplinary practice.

## CONCLUSION

WHEREFORE, for all the foregoing, Mr. Bayer respectfully moves this Honorable Court to enter an Order dismissing Plaintiff's Complaint as well as for any other relief this Court deems just and proper.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of March, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will in turn, sends a notice of electronic filing to Matthew D. Bavaro, Bavaro Legal, LLC, 377 N. SR 7 Suite 201, Plantation, FL 33317, Maria Kayanan, ACLU Foundation of Florida, Inc., 4500 Biscayne Boulevard, Ste. 340, Miami, FL 33137; Randall C. Marshall, ACLU Foundation of Florida, Inc., 4500 Biscayne Boulevard Suite 340, Miami, FL 33137.

VERNIS & BOWLING OF MIAMI, P.A.
Counsel for Defendant,
*Peter Bayer*
1680 N.E. 135th Street
North Miami, FL 33181
(305) 895-3035
Fax: (305) 892-1260

By s/ Carlos E. Mustelier Jr.
Carlos E. Mustelier Jr.
Fla. Bar No. 058033
cmustelier@florida-law.com