UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-61952-CIV-GARBER

KATHERINE EVANS,
    Plaintiff,

v.

PETER BAYER, in his individual
capacity,
    Defendant.

_____/

## ORDER

THIS CAUSE is before the Court on defendant Peter Bayer's Motion to Dismiss [DE 6]. The Court has received plaintiff Katherine Evans's Response in Opposition [DE 8], and Peter Bayer's Reply [DE 13].

### Background

Katherine Evans ("Evans") was a senior at Pembroke Pines Charter High School in November 2007. Peter Bayer ("Bayer") was principal at that time. During the evening of November 9, 2007, Evans created a group on Facebook, a social networking website, entitled, "Ms. Sarah Phelps is the worst teacher I've ever met." The group's purpose was for students to voice their dislike of the Ms. Phelps. Evans posted the following:

> Ms. Sarah Phelps is the worst teacher I've ever met! To those select students who have had the displeasure of having Ms. Sarah Phelps, or simply knowing her and her insane antics: Here is the place to express your feelings of hatred.

Three postings appeared on the page from other students supporting Ms. Phelps and debasing Evans for creating the group. The page included Ms. Phelp's photograph. The posting did not contain

threats of violence. This posting was made after school hours and from Evans's home computer. Ms. Phelps never saw the posting and it did not disrupt school activities. Evans removed the posting after two days. After its removal, the posting came to the attention of Bayer.

Bayer, as principal, suspended Evans from school for three days and forced her to move from her advanced placement ("AP") classes into lesser weighted honors courses. Evans's "Notice of Suspension" states that she was suspended for, "Bullying/Cyber Bullying/Harassment towards a staff member" and "Disruptive behavior." See DE 1 at Exh. B. Evans alleges that she engaged in an off-campus activity in a non-violent and non-threatening public forum and that her punishment resulted in an unjustified stain on her academic reputation and good standing.

Evans argues that Bayer's actions violated her First and Fourteenth Amendment rights and that her rights may be redressed pursuant to 42 U.S.C. §1983. She seeks an injunction enjoining Bayer from maintaining records relating to the suspension on her permanent school record and revoking, *nunc pro tunc*, the three-day suspension. Evans is also seeking nominal damages for the deprivation of her First and Fourteenth Amendment rights, as well as attorneys' fees and costs.

**Standard**

In considering a motion to dismiss pursuant to Federal Rule 12(b)(6), all factual allegations must be taken as true and in the light most favorable to plaintiff. *See Erickson v. Pardus*, 551 U.S. 89 (2007). Federal Rule of Civil Procedure 8 allows for a liberal pleading requirement. It does not require a plaintiff to plead with particularity every element of a cause of action. *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir.2001). However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v.*

*Twombly*, 550 US 544, 555 (2007) (internal citations omitted).

## Analysis

Bayer's primary argument is that qualified immunity shields him from litigation. Second, Bayer claims that even if he is not immune, he was acting pursuant to a school's right to discipline students for potentially disruptive behavior. Last, Bayer claims that even if he acted inappropriately by his actions, the relief sought against Bayer can only be granted in his official capacity, not his individual. The Court will discuss Bayer's arguments as they apply to each request for relief.

I. Injunction

The law is clear: Qualified immunity does not shield Bayer from an action for injunctive relief. *D'Aguanno v. Gallagher*, 50 F.3d 877, 879 (11th Cir. 1995). This has been categorical. Bayer, however, argues that the Eleventh Circuit and other courts have been too blinkered in their view. Bayer cites the following language describing qualified immunity from the Supreme Court in support: "the consequences with which we were concerned in *Harlow* are not limited to money damages; they also include the general costs of subjecting officials to the risks of trial – distraction of officials from their government duties, inhibition of discretionary action, and deterrence of able people from public service." *Mitchell v. Forsyth*, 472 U.S. 511, 524–25 (1985). Thus, Bayer argues, because a suit for injunctive relief also subjects officials to trial, qualified immunity should be available. Bayer's argument fails for two reasons. First, the Supreme Court was not examining the issue of injunctive relief when it chose its language; it was deciding that a determination on the question of qualified immunity should be immediately appealable. The Supreme Court reasoned that as qualified immunity is the right from suit, it would be lost if a rejection was not appealable until disposition of the action. Second, regardless of the interpretation someone may make of such language in isolation, the Eleventh Circuit has ruled to the contrary.

An issue remains, however, concerning whether injunctive relief can be sought against a defendant in his individual capacity if the act must be in his official capacity to have official consequences. The Court finds the answer to be no. Evans argues that the Court can compel Bayer to destroy the records in question and sanction those who inhibit his action. Bayer contends that the Court cannot compel him to act in violation of his employer's policies or state law. Bayer's first premise is dubious, his second may have merit. But in either event, the Court need not untangle this knot. Even if the Court could compel Bayer to act in his individual capacity, the compelled action would have no official consequences. The only decision the Court has found on point agrees. The District Court of the Eastern District of Pennsylvania wrote, "[w]e do not see how a court can order an officer in his personal capacity to take an official act." *Barrish v. Cappy*, No. 06-837, 2006 WL 999974, at *4 (E.D. Pa.. Apr. 17, 2006). Accordingly, Evans's demand for an injunction is DISMISSED WITHOUT PREJUDICE. Evans has leave to file an amended complaint naming the proper parties.

II. Nominal Damages

Plaintiff also sues Bayer for nominal damages. An official who is sued in his personal capacity may be shielded from damages by qualified immunity. *D'Aguanno*, 50 F.3d at 879 However, determining whether qualified immunity applies requires an official to demonstrate that he was acting in his discretionary capacity. *Holloman v. Harland*, 370 F.3d 1252, 1263-64 (11th Cir. 2004). An official is acting in his discretionary capacity if he was "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Id*. at 1265. The Court looks to the "general nature of the defendant's action . . . putting aside the fact that it have been" unconstitutional. *Id*. at 1266. Bayer was clearly acting in a discretionary capacity. His discretionary duties include the administration of discipline. *Id*. at 1267. Clearly, suspending a student falls within a principal's "arsenal of powers" that he may use to

accomplish his goal. *Id*. Once it has been established that an official "was engaged in a discretionary function, then the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." *Id*. at 1264.

To overcome qualified immunity, the plaintiff must show (1) that the defendant violated a constitutional right, and (2) that this right was clearly established at the time of the alleged violation. *Id*. (citing *Wilson v. Layne*, 526 U.S. 603, 609 (1999)). Bayer claims that the right, in the form of a group posting on the internet by a student about a teacher, was not clearly established at the time he set the three day suspension. The Court examines each prong in turn.

i. Constitutional Right

The speech clause of the First Amendment protects two rights: (1) the right to freedom of expression, and (2) the right to be free from compelled expression. *Holloman*, 370 F.3d at 1264. But while these rights exist in public schools, they are there curtailed. "The constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Morse v. Frederick*, 551 U.S. 393, 396-97 (2007) (quoting *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 682 (1986)).

The seminal Supreme Court case dealing with student speech, *Tinker v. Des Moines Independent Community School Dist.*, established the backdrop for examining cases involving student speech. 393 U.S. 503 (1969). *Tinker* stated:

> [C]onduct by the student, in class or out of it, which for any reason-whether it stems from time, place, or type of behavior-materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.

*Id.* at 513. A "showing that the students' activities would materially and substantially disrupt the work and discipline of the school" is necessary to justify suppression of student expression. *Id. Tinker*, however, dealt only with on-campus speech. More recently, the Supreme Court has also

ruled that student speech at off-campus, school sponsored activities, is subject to limitations. *See Morse v. Frederick*, 551 U.S. 393 (2007).

Student off-campus speech, though generally protected, could be subject to analysis under the *Tinker* standard as well if the speech raises on-campus concerns. *See, e.g., J.S. v. Blue Mountain School Dist.*, No. 08-4138, 2010 WL 376186 (3d Cir. Feb. 4, 2010); *Doninger v. Niehoff*, 527 F.3d 41, 50 (2d Cir. 2008); *Wisniewski v. Board of Educ. of Weedsport Cent. School Dist.*, 494 F.3d 34, 38-39 (2d Cir. 2007). Where the speech occurs should be determined at the outset in order to decide whether the "unique concerns" of the school environment are implicated. *J.S. v. Bethlehem Area School District*, 807 A.2d 847 (Pa. 2002). Thus, to decide what level of protection, if any, Evans's speech is entitled, the Court must determine whether her speech occurred on- or off-campus. We start with the Supreme Court's most recent decision addressing student speech.

During the Olympic torch relay, Joseph Frederick, a high-school senior, unfurled a banner that read "BONG HiTS 4 JESUS" across the street from his school. *Morse v. Frederick*, 551 U.S. 393 (2007). His principal told him to take the banner down; Frederick refused and was ultimately suspended. The Ninth Circuit held that the principal's actions violated the First Amendment, and that Frederick could sue the principal. The principal appealed, and the Supreme Court reversed. In holding that the speech was not protected because it could reasonably be viewed as promoting illegal drug use, the Supreme Court found that the student's speech, which took place off school property, was on-campus speech because it occurred during a school sponsored event. *Id.* at 400-01, 408. The Supreme Court recognized that there is some uncertainty at the outer boundaries as to when courts should apply school-speech precedents. *Id.* at 401. The event occurred during normal school hours as the school's principal had let students out early so that they could watch the relay. However, the Supreme Court reasoned that the facts were such that there was no uncertainty in that instance—teachers and administrators were interspersed among the students and charged with

supervising them, and the high school band and cheerleaders performed.

While the *Frederick* decision offers little aid in solving the specific issue of student speech published on the internet, it does, however, make clear that the operative test is not a simple one of geography. Where the speech is published is not the only question that needs to be asked.

In *J.S. v. Bethlehem Area School District*, the court was confronted with a website created by a student at home. 807 A.2d 847 (Pa. 2002). The website was titled "Teacher Sux" and "consisted of a number of web pages that made derogatory, profane, offensive and threatening comments, primarily about the student's algebra teacher " and principal. *Id.* at 851. The student told other students about the website and showed it to another student at school. *Id*. At 852. The Court found that the speech was on-campus because "J.S., . . . facilitated the on-campus nature of the speech by accessing the web site on a school computer in a classroom, showing the site to another student, and by informing other students at school of the existence of the web site." *Id*. at 865. The court also found it important that the "web site was aimed not at a random audience, but at the specific audience of students and others connected with this particular School District." *Id*. And so the court held as follows: "[W]here speech that is aimed at a specific school and/or its personnel is brought onto the school campus or accessed at school by its originator, the speech will be considered on-campus speech." *Id*. at 865.

Generally, this decision follows a line of early cases that have determined that student speech concerns are implicated when speech published off-campus is brought on-campus. In *Boucher v. School Board of the School District of Greenfield*, the Seventh Circuit determined that an underground school newspaper, although unaffiliated with the school and printed off campus, was on campus student speech because the newspaper was distributed on school grounds and the article in question advocated on-campus activity. 134 F.3d 821, 829 (7th Cir. 1998). In *Bystrom v. Fridley High School*, the court analyzed an underground newspaper distributed on campus during lunch

under the rubric of student speech. 686 F.Supp. 1387, 1391 (D. Minn. 1987). While this test, whether speech published off-campus was brought on-campus, is not as easily suited to intangible situations like the internet, ultimately some guise of it will control.

The other possibility, referenced in *J.S.*, would be whether the speech is directed at a particular audience. This in some ways would be much more simple, but, would prohibit students from publishing a newspaper off-campus aimed at other students and distributing that paper off-campus, a scenario which has been decided in favor of the students. *See Thomas v. Board of Ed., Granville Central School Dist.*, 607 F.2d 1043, 1045 (2d Cir. 1979). Of course, there is nothing fundamentally unsound about this test, and any test is going to be over or under inclusive.

Thus, the question is whether the fact that Plaintiff's speech was arguably aimed at a particular audience at the school is enough by itself to label the speech on-campus speech. While further development of the facts may result in a different determination, the Court finds that it is not. This is not to suggest that speech made off-campus and accessed on-campus cannot be handled as on-campus speech. As noted, this is not a novel situation and has been dealt with by other courts. But here we have speech that was made off-campus, never accessed on-campus, and was no longer accessible when the Defendant learned of it.

One of the most recent decisions regarding internet student speech is instructive. In *Layshock v. Hermitage School District*, the Third Circuit examined whether a school district can punish a student for expressive conduct that originated outside of the classroom, when that conduct did not disturb the school environment and was not related to any school sponsored event. Nos. 07-4465, 07-4555, 2010 WL 376184, at *1 (3d Cir. Feb. 4, 2010). Justin Layshock created a fictitious profile of his school's principal on Myspace, another social networking website. Layshock used the principal's photo from the school website and gave fake answers to various questions. The profile was created after school hours and off-campus, at Layshock's grandmother's house. The page was

accessed by Layshock and other students during school. Some teachers also reported disruption in their classes which involved students congregating and talking about the page, as well as the cancellation of computer programming classes. As punishment, Layshock received a ten day suspension.

The district court entered summary judgment in favor of Layshock and against the school district for Layshock's First Amendment claim. On appeal, the school district argued that it was allowed to regulate the plaintiff's conduct because there was a "sufficient nexus " between the creation and the distribution of the profile. This is because the "speech" initially began on-campus, with the misappropriation of the picture from the school's website, the speech was aimed at the school district community and the principal, and was accessed on-campus by Layshock. The school district also argued that it was "reasonably foreseeable that the profile would come to the attention" of the district and the principal. *Id*. at *7.

The Third Circuit was not persuaded. It found the relationship between Layshock's conduct and the school too attenuated to allow the school district to "stretch its authority so far that it reaches Justin while he is sitting in his grandmother's home after school." *Id*. at *8. The court explained:

> It would be an unseemly and dangerous precedent to allow the state in the guise of school authorities to reach into a child's home and control his/her actions there to the same extent that they can control that child when he/she participates in school sponsored activities. Allowing the District to punish Justin for conduct he engaged in using his grandmother's computer while at his grandmother's house would create just such a precedent and we therefore conclude that the district court correctly ruled that the District's response to Justin's expressive conduct violated the First Amendment guarantee of free expression.

Evans's speech did not occur at a school sponsored activity, nor did she even go as far as the plaintiff in *Layshock*, and access the profile at school. Therefore, the Court finds that Evan's speech—her publication of the Facebook page—is off-campus speech.

But, the inquiry does not end because schools can discipline off-campus speech if it is unprotected speech. For example, in *Fenton v. Stear*, a student called a teacher a "prick" in the parking lot of a shopping center. 423 F.Supp. 767 (D.C. Pa. 1976). The student was given a three-day in-school suspension. The court found that the student's comments were 'fighting words', or "words . . . which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id*. at 771. However, the school's authority is far less reaching where the speech involved is off-campus. In *Thomas v. Board of Ed., Granville Central School Dist*., a group of students created a satirical publication that was largely created and distributed outside of school. 607 F.2d 1043, 1045 (2d Cir. 1979). The students stored the publication in a closet at school and occasionally used school resources to type articles. The Second Circuit found that the activity in the school itself was "De minimus" and held, "because school officials have ventured out of the school yard and into the general community where the freedom accorded expression is at its zenith, their actions must be evaluated by the principles that bind government officials in the public arena." *Id*. at 1049-51. The court found that the situation at hand was a factual context distinct from that envisioned by *Tinker* and its progeny. *Id*. at 1051. Indeed, if Evans had run an editorial in the publication at issue in *Thomas* with the same subject matter as her Facebook group, the outcome of *Thomas* would not have changed.

Bayer argues that under a *Tinker* standard, Evans's speech would not be protected. Bayer contends that the manner in which Evans disparaged Ms. Phelps "has serious consequences for the potentially defamatory content and for which the teacher would be unable to properly respond." DE 6 at 14. It is "this type of disruption" that school officials are entitled to protect against. *Id*. Bayer relies on *Layshock v. Hermitage School District*, for the proposition that "school administrators need not wait until a 'substantial disruption' has already occurred prior to taking action." 496 F.Supp.2d 587, 597 (W.D. Penn. 2007) (internal citations omitted).

However, the key is whether the school administrators have a well-founded belief that a "substantial" disruption will occur. *Tinker,* 393 U.S. at 514; *J.S. v. Blue Mountain School Dist.*, No. 08-4138, 2010 WL 376186, at *9 (3d Cir. Feb. 4, 2010). "A mere desire to avoid discomfort or unpleasantness will not suffice….[T]he government may not prohibit student speech based solely upon the emotive impact that its offensive content may have on the listener. *Layshock*, 496 F.Supp. 2d at 597. A showing of past incidents arising out of similar speech may pass muster. *Blue Mountain School Dist.*, 2010 WL 376186, at *9.

Nothing in the Complaint indicates that a well founded expectation of disruption was present. Perhaps as more facts develop, this will come to light, but at this point, no expectation has been demonstrated. Moreover, if school administrators were able to restrict speech based upon a concern for the potential of defamation, as Bayer claims, students everywhere would be prohibited from the slightest criticism of their teachers, whether inside or outside of the classroom. Regarding Bayer's other premise, the Court is not convinced that whether a teacher is available to properly respond is a proper inquiry for a First Amendment claim and Bayer has not cited precedent to the fact.

Bayer also suggests that an analysis under *Bethel School Dist. No. 403 v. Fraser* offers an alternative option in deciphering the boundaries of protected speech. 478 U.S. 675, 681 (1986). In *Fraser*, a high school student was suspended for delivering a nominating speech at a school assembly using "an elaborate, graphic, and explicit sexual metaphor." *Id*. at 678. In upholding the suspension, the Court engaged in a balancing act and resolved that "it was perfectly appropriate for the school to disassociate itself to make the point to the pupils that vulgar speech and lewd conduct is wholly inconsistent with the "fundamental values" of public school education." *Id*. at 685-86. The Court stated:

> [T]hese "fundamental values" must also take into account consideration of the sensibilities of others, and, in the case of a school, the sensibilities of fellow students. The undoubted freedom to advocate unpopular and controversial views in schools and

> classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior. Even the most heated political discourse in a democratic society requires consideration for the personal sensibilities of the other participants and audiences.

*Id*. at 681.  While the Court agrees that a school should not condone the use of vulgar or lewd language, quite simply, the case at hand does not involve the same type of speech as *Fraser*, nor is it in the same context.  Evans's Facebook group does not undermine the "fundamental values" of a school education.  Fraser's First Amendment rights were circumscribed in light of the school environment in which the speech occurred.  *Morse v. Frederick*, 551 U.S. 393, 405 (2007).  For the Court to equate a school assembly to the entire internet would set a precedent too far reaching.  Furthermore, the Supreme Court has recognized that "[h]ad Fraser delivered the same speech in a public forum outside the school context, it would have been protected."  *Id*.

Bayer, seemingly, also argues that Evans's speech is not protected because it is libel and could trigger a defamation action.  Libel or defamation is indeed an exception from that speech that is protected by the First Amendment.  Florida courts follow the Restatement Second of Torts as to defamation actions.  *Barnes v. Horan*, 841 So.2d 472, 476 (Fla. Dist. Ct. App. 2002).  A statement of pure opinion does not give rise to a defamation action.  *Scott v. Busch*, 907 So.2d 662, 667-68 (Fla. Dist. Ct. App. 2005).  But, if an opinion infers a factual basis for it, that is a mixed-opinion, which may give rise to a defamation action. RST Torts 566.  A student calling a "teacher her worst teacher ever" is clearly opinion.  Bayer argues that to discipline Evans, the teacher does not have to have a viable defamation complaint merely a putative one.  Bayer cites no case to justify this distinction, and the Court cannot find one.  Moreover, the Court finds the concept incredible that First Amendment protection would ebb and flow with the willingness of plaintiffs to pay a court filing fee.

Regardless of the standard used, Evans's speech falls under the wide umbrella of protected speech.  It was an opinion of a student about a teacher, that was published off-campus, did not cause

any disruption on-campus, and was not lewd, vulgar, threatening, or advocating illegal or dangerous behavior.  Therefore, the Court finds that Evans had a constitutional right.  The next inquiry is whether it was a clearly established right.

ii. Clearly Established

"It is . . . appropriate for a district court to grant the defense of qualified immunity at the motion to dismiss stage if the complaint 'fails to allege the violation of a clearly established constitutional right.'"  *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003) (citing *Chesser v. Sparks,* 248 F.3d 1117, 1121 (11th Cir.2001).  To be clearly established, "there is no need that the 'very action in question have previously been held unlawful.'"  *Stafford Unified School District et al., v. Redding*, 129 S.Ct. 2633, 2643 (2009) (quoting *Wilson v. Layne*, 526 US 603, 615 (1999).  Rather, the question is whether "'the state of the law [at the time of the events in question] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'"  *Holloman*, 370 F.3d at 1278 (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)) (internal edits removed).  "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."  *Hope*, 536 U.S. at 741.

Bayer argues that there is no established rule on student internet speech.  This confusion certainly exists as to a number of questions (e.g., whether the speech was on campus or off; and the level of disruption or distraction tolerable).  As one court has stated: "If courts and legal scholars cannot discern the contours of First Amendment protections for student internet speech, then it is certainly unreasonable to expect school administrators, such as Defendants, to predict where the line between on- and off- campus speech will be drawn in this new digital era."  *Doninger v. Niehoff*,  594 F.Supp.2d 211, 224 (D. Conn. 2009).

Bayer relies on *Doninger v. Niehoff*, 527 F. 3d 41 (2d Cir. 2008), and *Kubany v. The School Board of Pinellas County*, 839 F.Supp. 1544 (M.D. Fla. 1993), for the proposition that the right was

not clearly established. However, these cases involved off-campus conduct that resulted in disruption on-campus. While they establish certain parameters of unprotected speech, the speech at issue here is categorically different. Each case will be discussed in turn.

In *Doninger*, a group of four student sent an email, and then one of them posted a derogatory message on a blog, encouraging students to call and email the district superintendent to urge that a school event go on as scheduled. 527 F.3d at 43. In the blog entry, the student complained that a school activity was cancelled "due to douchebags in central office" and encouraged students to contact the office in order to "piss [the district superintendent] off more." *Id*. at 45. The student was prohibited from running for senior class secretary and then sought injunctive relief allowing her to run for office. The circuit court affirmed the district court's denial of relief because the student's out of school conduct "created a foreseeable risk of substantial disruption to the work and discipline of the school." *Id*. at 53. Indeed, the student herself admitted that a sit-in was possible as the students were all "riled up." *Id*. at 51. The principal and superintendent actually received an "influx" of phone calls that required their attention. *Id*. at 46. Most significant in this instance, is that the court found that the blog posting directly invited an on-campus response in the form of disrupting the school with emails and phone calls. Evans, on the other hand, did not attempt to engage other students in any on-campus behavior.

*Kubany* involved a principal being sued for taking disciplinary action against a high school student who violated a school board policy against drinking alcohol. *Kubany*, 839 F.Supp at 1546. The student drank a beer and then attended a school football game. *Id*. The school had a policy in place prohibiting students from being under the influence of alcohol at school sponsored events. *Id*. First, the Court notes that *Kubany* is not a free speech case. Rather, it is a due process and equal protection case. *Id*. at 1546-47. While Bayer uses this case to bolster his contention that he was operating under his discretion to interpret a school board policy, Bayer's discretion does not stretch

so far beyond the schoolhouse gate.  In *Kubany*, the student actually participated in a school sponsored event.  Moreover, while "cyber bullying," "bullying," "harassment of a staff member," and "disruptive behavior" may indeed be offenses that Bayer has discretion to punish, the pleadings alone do not establish the definitions of these offenses.[1]  Therefore, the Court is not in a position to determine whether Evans's conduct was in violation of a school policy.  Furthermore, even if Bayer were enforcing school policies, Evans's comments do not amount to the type of speech that courts have found to be unprotected.   Surely Bayer uses his discretion in deciding what constitutes cyber bullying, bullying, harassment, or disruption.

While the controlling precedent may be unclear, this confusion cannot save Bayer when his actions do not even comport with the requirements for the regulation of on-campus speech.  *Tinker* requires established prerequisites.  As discussed, there must be an indication of disruption, future or present. While subsequent development of the facts may establish such disruption; the facts as pled, do not.  In fact, the time line they establish contravenes even the implication.  According to the alleged facts, Plaintiff created her page, received some negative comments from other students, and removed her page.  Only after the page was removed, did the defendant learn of the page and discipline the student.  In short, the potential spark of disruption had sputtered out, and all that remained was the opportunity to punish.  If Defendant believed that Evans's speech was on-campus there is clear precedent as to what standards Defendant was to apply.  However, as determined, nothing about Evans's speech gives the appearance of being on-campus.

Faced with a similar time line in *Layshock*, the District Court of the W.D. of Pennsylvania

---

[1] The Court notes Bayer's additional argument that conflicting allegations in the Complaint exist between the allegations in the Complaint and an exhibit to the Complaint.  The Notice of Suspension is attached to the Complaint.   It lists the reasons for the suspension as: "Bullying/Cyber Bullying/Harassment towards a staff member" and "Disruptive behavior."  DE 1 at Exh. B.  Bayer contends that the Notice is evidence that Evans broke the school's policy and is contradictory of allegations in the Complaint.  In the Court's view, this is not interpreted as an admission or proof that Evans engaged in those acts.  Rather, the Court perceives it as evidence of the punishment Evans received.

found the officials were entitled to qualified immunity because while the school's discipline failed under the *Tinker* test, it was unclear what the test would be for off-campus student speech. 496 F.Supp.2d 587, 603-04 (W.D. Pa. 2007). This Court respectfully disagrees with that court's logic. A school's action would fail a more lenient standard for off-campus speech if it failed the more stringent *Tinker* test, as in the instant case. This Court finds that the facts are such that under any form of the *Tinker* test, Evans's actions cannot be construed as even remotely disruptive, nor was her speech in any way lewd, vulgar, defamatory, promoting drug use or violence as seen in other cases. Furthermore, unlike *Layshock*, the profile was never accessed at school, as it was removed before the students returned to school from an extended weekend. There was no disruption in classes, and as alleged, no teachers were involved in quieting students or missing classes. Therefore, the Court finds that the right in question was clearly established. Accordingly, Bayer's Motion to Dismiss is DENIED as to Evans's demand for nominal damages.

III. Attorneys' Fees

Having determined that Bayer does not have qualified immunity, he is subject to the possibility of paying attorneys' fees if Evans prevails pursuant to 42 U.S.C. §1988. Section 1988 states:

> [T]he court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.

Accordingly, Bayer's Motion to Dismiss is DENIED as to Evans's demand for attorneys' fees. It is hereby

ORDERED that Defendant's Motion to Dismiss is GRANTED IN PART AND DENIED IN PART as set forth above. Plaintiff's request for an injunction is hereby DISMISSED WITHOUT PREJUDICE. Plaintiff has leave to file an amended complaint.

DONE AND ORDERED in Chambers at Miami, Florida this 12th day of February, 2010.

*Barry L. Garber*
BARRY L. GARBER
UNITED STATES MAGISTRATE JUDGE